ARTHUR A. PETERS & others *vs.* CITY OF WESTFIELD
& others.

Hampden.    November 10, 1967. — February 7, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Zoning,* Validity, Reclassification, Spot zoning.

With respect to a corner lot containing a fifty year old rooming house and
   located in a residential zone on the south side of a principal thorough-
   fare of a growing city and the west side of a residential street, and
   bounded on the west by the easterly boundary of a business zone
   which crossed the thoroughfare northeasterly and then continued on
   northerly opposite a part of the lot, an amendment of the zoning
   ordinance of the city changing the classification of the lot to a busi-
   ness zone more restricted than the business zone adjoining it could not
   be ruled invalid as spot zoning in the circumstances, including the de-
   sirability of straightening out the boundary between business areas
   and the residential zone easterly of the lot, changes in the neighborhood
   making the thoroughfare, which "in the past was almost wholly resi-
   dential," "solidly business" up to the lot on the west, and nonresi-
   dential use of nearby properties on the east.

BILL IN EQUITY filed in the Superior Court on December 31, 1963.

The plaintiffs appealed from an interlocutory decree
confirming a master's report and from a final decree by
*O'Malley,* J., declaring a zoning reclassification valid.

*Joseph C. Stohert (Harold A. Murphy* with him) for the
plaintiffs.

*Richard T. Dolan,* City Solicitor, for the City of West-
field.

*Edward M. Lee* for the defendant Emilio D. Alanzo,
trustee of D. P. A. Trust.

WHITTEMORE, J. The plaintiffs seek a declaration under
G. L. c. 231A that a zoning amendment adopted by the city
council on December 5, 1963, is invalid. The facts are
found in a master's report. The ordinance reclassified

from Residence C to Business A-1 a lot of approximately 19,000 square feet on the corner of Main and State streets

in Westfield. It is one of two lots in the block on the south
side of Main Street between Taylor Avenue and State Street.
The other lot is in the adjacent Business B zone. The
effect of the rezoning was to move the boundary line between
a business district and a residential district from the middle
of the block to the east side of the block at State Street.
As shown on the accompanying sketch plan, the easterly
boundary of the business district on the north side of Main
Street lies somewhat westerly of an extension of the westerly
line of State Street (which does not cross Main Street) but
some distance easterly of an extension of the easterly boun-
dary of the Business B district on the south side of Main
Street.

The Business A-1 zone is a somewhat more restricted
zone than the adjacent Business B zone, notably in the
specific exclusion of taverns, public garages, gasoline and
oil filling stations, automobile sales rooms and used car lots.

The rezoned parcel includes a twelve-room fifty year old
dwelling house in which in the past rooms had been rented.
It was expensive to heat and the owners had sought unsuc-
cessfully to sell it as a residence. It is "practically indis-
tinguishable" from the house on the adjacent lot in the
Business B district which is used as a rooming house. The
master found also that it is practically indistinguishable
from the house across State Street from the locus which is
in the residential zone. The present owners had received
an offer for $23,000 for the locus subject to its rezoning for
business. The proposal is for the use of the premises as a
retail dress shop. The rezoning was voted by the city council
after the unanimous approval of the planning board. The
board noted that the rezoning would "square off" the
existing business area "and would constitute the best use
for the property in question."

Main Street is a principal thoroughfare of the city and
as Route 20, it carries traffic from points east and west.
The house directly across Main Street from the locus is
used for a funeral home. Certain nearby properties in the
Residence C zone to the east have nonresidential uses.

Across State Street, on the south side of Main Street, is a
real estate office; on the other side of Main Street are an
American Legion post and a fruit stand, respectively 800
and 1,600 feet easterly of the locus.   The Residence C
district extends roughly one third of the way down State
Street embracing three lots on each side of State Street on
which the houses are attractive and in good repair.   South
of these lots the zone is Residence B, a more restricted zone.

That the rezoning was to Business A-1 rather than Busi-
ness B did not make it spot zoning.   The new district per-
mitted placing the locus in a business area but with restric-
tions appropriate to its position as a buffer lot.

There had been changes in the neighborhood which tended
to support reconsideration of the zone boundary.   The city
has grown, traffic on Main Street has increased, and "Main
Street, which in the past was almost wholly residential,
has become solidly business up to the locus on the west over
the past twenty . . . years, and even across the street
from the locus . . . [was a] . . . funeral home."   That
Main Street to the east had on the whole maintained a pre-
dominantly residential character was a counter factor to be
weighed but it did not in itself bar reconsideration of the
zoning boundary location; so too was the adverse effect
on traffic congestion on Main Street because of the addi-
tional business premises thereon.[1]   The city's planning
consultant, working with the planning board, had drawn a
master plan which was "filed with the Planning Board for its
guidance in 1962. . . . [I]ts transportation map indicated
the locus as a part of a 'proposed central business district.'
The map does not represent the consultant's thinking . . .
[as] he was opposed to the locus as business, but it does
represent the Planning Board's ideas."

The new location for the easterly boundary of the business
district is not inconsistent with good planning.   The council

[1] "The street in 1965 is operating at its practical traffic capacity, meaning
that traffic is now at a maximum for good operation.   The street in general
is a high accident area, there being eleven . . . motor vehicle accidents in
1962, nine . . . in 1963 and seven . . . in 1964 on Main Street in the vi-
cinity . . . of State Street."

could have deemed it a better location for that boundary. Leaving in the residence zone one lot on the corner of a main thoroughfare with a business zone beside it and in part opposite it, tended to make that lot unattractive for residential purposes. We assume that the purpose of the original arrangement was to protect State Street as a residential street and to protect the lots to the east on Main Street in their residential use. It could be deemed that this purpose had been achieved at the cost of a less than suitable classification for the locus itself.

The classification is not rendered arbitrary by the change. There is no singling out of one lot for different treatment from that accorded surrounding land indistinguishable from it in character. *Lanner* v. *Board of Appeal of Tewksbury,* 348 Mass. 220, 229–230. Because of its location on the corner and adjacent to the business district and because of the character of the uses of nearby properties, the locus is distinguished from the other residential parcels in the Residence C district. *Muto* v. *Springfield,* 349 Mass. 479, 482–483, and cases cited.

It is plain that a single appropriate boundary change, consistent with the long range plan, has been adopted at this time at the instigation of the lot owners who will profit therefrom. It cannot be ruled, however, that benefiting them is the sole purpose of the change. *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 595–596. *Raymond* v. *Commissioner of Pub. Works of Lowell,* 333 Mass. 410, 412. *Lanner* v. *Board of Appeal of Tewksbury, supra.*

There are sound reasons against accomplishing appropriate zoning changes piecemeal. Nibbling at the edges of established districts tends to remove the protection of the existing zoning ordinance without substituting another overall plan under which hurt to individual properties may be deemed offset or justified by the general advantage. As with the *Muto* case, *supra,* this case is only narrowly differentiated from those in which we have ruled a classification invalid. We are unable to rule, however, that the council could not find that it would be reasonably related to public

convenience and welfare and calculated to encourage the most appropriate use of land throughout the city. *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 595, 597. Compare *Schertzer* v. *Somerville,* 345 Mass. 747, 750–752.

*Interlocutory and final decrees affirmed.*