729

Michael B. MOSKOW,
Donna MOSKOW,
Laylor BURDICK, Sidney SCHEIN,
Frank M. PERKINS, Plaintiffs
vs.
CITY OF NEWTON,
CHESTNUT HILL
DEVELOPMENT CORPORATION,
Eleanor THANOS, Trustee of the
SIDNEY HILL TRUST, Alan FRASER,
Building Commissioner of the
City of Newton, Defendants

No. 106294

Land Court Division/Middlesex, ss.
Trial Court of the
Commonwealth of Massachusetts

June 14, 1982

Michael B. MOSKOW,
Donna MOSKOW,
Laylor BURDICK, Sidney SCHEIN,
Frank M. PERKINS, Plaintiffs
vs.
CHESTNUT HILL DEVELOPMENT
CORPORATION, THE BOARD
OF ALDERMEN
OF THE CITY OF NEWTON,
CITY OF NEWTON, Defendants

No. 81-6612

Superior Court/Middlesex, ss.
Commonwealth of Massachusetts

June 14, 1982

John M. Reed, counsel for plaintiff
Devra G. Bailin, counsel for plaintiff
Henry T. Goldman, counsel for defendant
Howard A. Levine, counsel for defendant

## DECISION

The plaintiffs in both actions are Michael B. Moskow, Donna Moskow, Laylor Burdick and Sidney Schein, all of Newton in the County of Middlesex, and Frank M. Perkins of Brookline in the County of Norfolk. They seek relief from the action of the Board of Aldermen of the City of Newton in adopting an amendment to the zoning plans which changed the district boundaries applicable to a large parcel of land in Florence Street from a Private Residence District to a Residence E District, and from the further action of the Board in granting a special permit to use the land thus zoned as a Residence E District for mid-rise condominiums. Both actions originally were filed in the Superior Court Department for the County of Middlesex. Civil Action 81-6611 which seeks a declaratory judgment that the zoning change is invalid and relief in the nature of mandamus was transferred to the Land Court Department on motion of the defendants to which the plaintiffs assented. The defendants in this action are the City of Newton, Chestnut Hill Development Corporation, the developer, Eleanor Thanos, Trustee of the Sidney Hill Trust, owner of the land affected by the rezoning, and Alan Fraser, the building commissioner of the City of Newton. Civil Action 81-6612 which attacks the special permit was transferred to the Land Court Department by the Chief Administrative Justice, after consultation with the Administrative Justice of the Superior Court Department, to be heard by a Land Court Department Justice sitting as a justice of the Superior Court Department pursuant

to a standing order dated January 27, 1979. The defendants in the second action are the developer, the Board of Aldermen of the City of Newton and each individual member, and the City.

I find and rule that the change in the zoning of the locus from a Private Residence District to a Residence E District and the simultaneous granting of a special permit covering the area rezoned to be used for purposes permitted in a Residence E District are not vulnerable to the plaintiffs' attack and are upheld.

The two cases were heard together (although not formally consolidated because of the diversity of departments) on March 29 to 30 and April 1, 1982. A view was taken by the Court in the presence of counsel on March 30. At the trial a stenographer was appointed each day to record and transcribe the testimony. It was agreed that all evidence would apply to each action. All exhibits introduced into evidence are incorporated herein for the purpose of any appeal. There were four witnesses called by the plaintiffs: Barry V. Canner, Director of Planning and Development in Newton, Eugene F. Kennedy, senior planner in the Planning division, Professor John T. Howard, an expert in planning, and one of the plaintiffs, Laylor Burdick. Witnesses for the defendant were Mr. Canner, William Pressley, a landscape architect, Charles Downe, a community planning consultant, Ethel W. Sheehan, a Newton Alderman at large and a member of the Board's Land Use Committee, and Jerold Kayden, a member of the faculty at Harvard University lecturing in urban law and planning. There were thirty exhibits introduced into evidence, some of which have multiple parts. The exhibits included a mounted two sheet planting and site plan of The Fountains (the name of the proposed condominiums), a compiled plan of the area showing the zoning districts and a mounted color-keyed plan of present land use in the area.

The parties entered into a statement of agreed facts in which they stipulated that certain facts might be taken as true and certain described documents as genuine copies of the originals. The facts to which the parties so stipulated are these, and I adopt them:

"1. The site which is the subject of these actions is a rectangular-shaped parcel of land consisting of approximately 331,578 square feet (approximately 7.6 acres) known as 77 Florence Street, Newton, Massachusetts. The site is approximately 360 feet wide where it fronts on Florence Street and is approximately 1020 feet deep. On the assessor's map, the site is located at Ward 8, Section 82, Block 4, Lots 73 and 74.

2. Plaintiffs Michael B. and Donna Moskow own and reside at the property located at 190 Dudley Road, Newton, Massachusetts, which abuts the south side of the site. Plaintiff Laylor Burdick owns and resides at the property located at 180 Dudley Road, Newton, Massachusetts, which is close to the south side of the site.

3. Plaintiff Stanley Schein owns and resides at the property located at 28 Tanglewood Road, Newton, Massachusetts, which abuts the east side of the site.

4. Plaintiff Frank M. Perkins owns and resides at the property located at 28 Lyon Road, Brookline, Massachusetts.

5. Defendant Eleanor Thanos, as she is Trustee of the Sidney Hill Trust, is the owner of the site.

6. Defendant Chestnut Hill Development Corp. is a corporation organized under the laws of the Commonwealth of Massachusetts and was the applicant for the chance of zone and special permit which are the subjects of these actions.

7. Defendant Alan Fraser is the Building Inspector of the City of Newton and at all relevant times was the official responsible for the enforcement of the zoning laws of the City of Newton. The other individual defendants were members of the Board of Aldermen of the City of Newton at all relevant times.

8. On the site is located the Sidney Hill Country Club, which was constructed in or shortly after 1955. In December 1981,

the facilities of Sidney Hill Country Club included a clubhouse, a swimming pool, six tennis courts, and parking lots (both in front and at the rear of the clubhouse) with a capacity of 232 cars.

9. . . . . . . . . .

10. On September 16, 1981 defendants Thanos and Chestnut Hill Development Corp. filed an application for a change of zone with respect to the site. That application was assigned No. 190-81C. On the same date, those parties filed an application with respect to the site for a special permit and site plan approval. That application was assigned No. 190-81D. Both applications were filed with the City Clerk of the City of Newton, the Board of Aldermen, and the Planning Board.

11. At the time that the aforesaid applications were filed the site was in a Private Residence zone.

12. . . . . . . . . .

13. Among the salient features of each of the residential zoning classifications in the City of Newton are the following:

I. Single Residence Districts

1. **Residence A**—single-family house; minimum lot of 25,000 square feet;

2. **Residence B**—single family house; minimum lot of 15,000 square feet.

3. **Residence C**—single family house; minimum lot of 10,000 square feet.

II. Other Residential Districts

1. **Private Residence**—two-family home; minimum lot of 10,000 square feet; attached dwellings permitted if special permit granted.

2. **Residence D**—townhouses and garden apartments if special permit granted.

3. **Residence E**—apartment buildings if special permit is granted.

4. **Residence F**—apartment buildings only, but with different height and dimension requirements.

14. The applications filed by defendants Thanos and Chestnut Hill Development Corp. were referred by the City Clerk to the City of Newton Planning & Development Department.

15. By report dated October 13, 1981, the City of Newton Planning & Development Department recommended approval of both applications . . . That report makes reference to a report dated May 11, 1981, prepared by the Department of Planning and Development, . . .

16. On October 13, 1981, public hearings were held at Newton City Hall before the Board of Aldermen sitting as a Board and special permit granting authority (through its Land Use Committee), and before the Newton Planning and Development Board. At that hearing, there was submitted to the Board, among other things, a traffic impact and access study prepared by Vanasse/Hangen Associates, Inc. and dated October, 1981 . . .

17. On October 15, 1981, the Planning & Development Board voted to approve both applications.

18. On November 23 and December 1, 1981 the Land Use Committee of the Board of Aldermen conducted open meetings to discuss the applications. On December 1, 1981, the Land Use Committee voted to approve the applications and on December 7, 1981, the Land Use Committee reported the applications and its vote to the Board of Aldermen.

19. At a special meeting of the Board of Aldermen on December 15, 1981, each of the applications was acted upon . . ."

The parties also agreed that the documents referred to in paragraphs 15, 16 and 17 above are evidence of information that the Board had before it when it adopted Ordinance 190-81C and granted the special permit and also evidence of the factual matters stated in such exhibits (but they did not, of course, stipulate that the conclusions therein are correct).

On all the evidence, I further find and rule as follows:

20. Board of Aldermen Order 190-81C (Joint Exhibit No. 6) amended "sheets of plans entitled "City of Newton, Mass., Zoning Plans" dated July 21, 1951, as theretofore amended to date, by changing

the district boundaries from Private Residence to Residence E District of the property described therein as follows:

"Land on Florence Street, Ware 8, Section 82, Block 4, Lots 73 and 74, containing approximately 331,578 square feet as shown on a plan entitled, "Plan to accompany petition of Eleanor Thanos, Trustee of the Sidney Hill Trust, Section 82, Block 4, Lots 73 and 74," by Barnes Engineering Company, dated September 15, 1981."

21. The special permit, Order 190-81D (Joint Exhibit No. 7) in its introductory paragraph recited:

"That the Board finding that the public convenience and welfare will be substantially served by its action and that said action will be without substantial detriment to the public good, and without substantially derogating from the intent or purpose of the Zoning Ordinance, the following SPECIAL PERMIT and SITE PLAN APPROVAL is hereby granted, in accordance with the recommendation of the Land Use Committee and the reasons given by the Committee therefor through its Chairman, Alderman Terry Morris."

The Board thereby approved the petition of Chestnut Hill Development Corporation for authority to construct on the locus 99 dwelling units consisting of 10 one bedroom 52 two bedroom and 37 two bedroom and study units subject to any necessary consent of the Newton Planning and Development Board acting as a Board of Survey, and to twelve detailed conditions set forth in full in the special permit. The number of units approved were less than the petitioner originally had requested. The same land rezoned by Ordinance R-202 is covered by the special permit, Application 190-81D.

22. Among the conditions imposed by the terms of the special permit were a requirement that construction necessitating the issuance of a building permit be commenced within one year, that the improvements, floor plans and building elevations be as shown on certain specified plans other than as to specific changes required by the Board, that solid waste be removed by a private rubbish collector, that any required larger water main on Florence Street be installed at the petitioner's expense, that use of the pool and health club be restricted to residents and their guests, that the Conservation Commission and City Engineer review and approve all improvements relating to Hahn Brook, that a Conservation Restriction be imposed on the southerly part of the site south of the fire access drive, and that five on-site one bedroom apartments be provided for low income elderly persons and four low income family units of at least two bedrooms with not less than 1,200 square feet in gross floor area each and two three bedroom units with not less than 1,350 gross floor area each be provided and located off site.

23. Florence Street runs southeasterly from Boylston Street (Route 9) to Hammond Pond Parkway in Brookline. The southerly side of Florence Street with minor exceptions has been situated within a Private Residence District since 1922, other than a portion of the frontage which was in a General Residence District until 1930. The Single Residence District on Dudley Road situated to the rear of the locus was established in 1930. On the northerly side of Florence Street there have been numerous zone changes since 1942. The block originally was zoned for residential purposes, first as a General Residence District and later as a Private Residence District. The district boundaries were changed during the 1950's to establish Business A Districts. The site of Valle's Restaurant was rezoned in 1957 and the Stop & Shop Shopping Center in 1955. What is now The Imperial Towers parking lot was rezoned as Residence D, and the front part of the lot encompassing the building and fronting on Route 9 was rezoned as a Business A District. Another Residence D

District was adopted in 1963, and the previous 1922 Manufacturing District eventually became a smaller Limited Manufacturing District.

24. In May of 1981 Chestnut Hill Development Corporation applied for a change of zone of the locus to a Business A District on which it proposed to build an apartment building with 171 condominium units and 24 townhouse units. The petition ultimately was withdrawn. The Planning and Development Department (the "Planning Department") as suggested in subparagraph 15 above, prepared a comprehensive report at this time in which it analyzed the locus, the adjoining farm property, the zoning history, the history of previous proposals, the neighborhood, development characteristics, traffic impact, the proposed site plan and other pertinent considerations. Subsequently, as stipulated by the parties in subparagraph 10, the applications which culminated in the present ordinance zoning change and special permit were filed with a request that there be a change of zone to Residence F District and a special permit granted for 112 condominium units. The Planning Department, as appears in subparagraph 15, again filed a comprehensive report in which it again analyzed in depth the proposals, the neighborhood, the property, planning considerations, the future of the area and its history. The change, as enacted, was to Residence E and the number of units was reduced to 99. Between those two reports, the Planning Department also prepared a report dated October 1, 1981 (Exhibit No. 12) in which it considered site goals and objectives for both locus and the adjoining Spezzano farm.

25. There had been earlier efforts to rezone the Spezzano Farm property which the Board of Aldermen had denied, and this was one of the reasons why there was some opposition to the present request at the hearing of the Land Use Committee. Conversely many characterized the Club as a nuisance and favored the proposed project to eliminate the traffic, off-site parking and noise problems generated by the Club.

26. The Sidney Hill side of Florence Street is predominantly residential, and over the years, as at present, an attempt has been made to preserve the residential character although present use of locus clearly is otherwise. The Planning Department recognized the advantages of preserving the residential character of this side of Florence Street albeit an increased density was required to make construction viable.

At the intersection of Florence Street with Route 9 (Exhibit 10C), there is a large Garden Shop named Seltzer's (Exhibits Nos. 10B and 10D), most of which is situated in a Private Residence District although two small portions are classified as a Business B zone and a Residence D zone respectively. Beyond Seltzer's extensive operation (and proceeding southeasterly toward Brookline on Florence Street) there are two or three single family homes fronting on Florence Street. Tanglewood Road then intersects Florence Street. On it are eighteen attractive modest single family homes built in the 1950's. At the corner of Tanglewood Road on Florence Street there is one more single family home before the locus. Adjacent to the locus on the southeast is a large working farm containing about 669,696 square feet known as the Spezzano farm. On it still remains a dilapidated hen house (Exhibit No. 10G). On Florence Street there are two older houses between the Club and farm properties, at least one of which is a two family dwelling. Also on Florence Street is a farm stand. The remainder of the frontage on the southerly side of the street before Louise Road consists of one and two family homes and vacant land. Louise Road is a neighborhood built in two stages, consisting primarily of two family duplexes. The northeasterly half was built in 1953, the southwesterly half in 1963. After Louise Road there are only two buildings on Florence Street before the Brookline town line. Westerly on

Route 9 from its intersection by Florence Street is a Residence D zone devoted to commercial uses with a Private Residence District in the rear extending out to Boylston Street where there are residences and a church under construction at the corner of Dudley Road and Route 9.

27. Very different uses have been made on the northerly side of Florence Street in the triangle formed by Boylston Street, Hammond Pond Parkway and Florence Street. Directly on Route 9 at the Florence Street intersection is Valle's Restaurant (Exhibit No. 10E), with an entrance to the parking lot on Florence Street. A high rise apartment (Imperial Towers) adjoins the restaurant property and fronts on Route 9 (Exhibits Nos. 9E and 10A). The parking lot is behind the building, but there is no motor vehicle access to it from Florence Street. Other uses in the triangle include a supermarket, Jenney Manufacturing, a bank, an office building, a small shopping complex with a Milton's store in it, a motel, another restaurant, and a condominium complex. On the Florence Street side of the triangle the grade is higher than that of Florence Street itself with the street sloping downward from Route 9. Thus there is a retaining wall with a fence above it behind most of Valle's Florence Street frontage and some of Imperial Towers' (See Exhibits Nos. 9E, 9H, 10A, 10D and 10E). On Florence Street there is an entrance to Jenney and Stop & Shop, and as perhaps an historical accident there are two old single family homes almost in the supermarket parking lot. There also is another home on Florence Street; as Florence Street approaches Brookline, there is a large nursing home on the northerly side of the street in Newton. The zoning is mixed, ranging from Business A to Residence D, to Limited Manufacturing to Residence E at the northeasterly end of the triangle on Route 9.

28. Across Route 9 there is a similar diversity of uses and zoning which again ra: _es from Business A to Residence C and F. There is the renowned Mall at Chestnut Hill anchored by two department stores, a high rise apartment house, and opposite the end of Florence Street a small business block (Exhibit No. 10C) and John Street on which there are residences.

29. The topography of the locus is unexceptional; it is higher in the front at the street line where there has been filling, and the land then gently slopes to the rear behind the building. The site would be described as generally level. Hahn Brook approximately follows the northwesterly line and then turns to cross locus and the farm. It is in part open and in part in a culvert. There is no outcropping of rock on locus as there is on the farm property where rock is found, both near the Florence Street frontage (which is in a different zoning district but which appears from the plans to be part of the farm) and again on Louise Road with a large finger spilling onto the farm. The grade rises at the rear of the farm (Exhibit No. 10H) and the homes on Dudley Road are at a higher elevation. (Exhibit No. 10F). Exhibit No. 21 depicts the elevations of the locus and the Farm and contour information and appears to be accurate. It was prepared by a witness who testified that the two properties were significantly different from a land planning point of view. To the layman, however, there appears to be no topographical difference between the properties sufficient in itself to prevent the same treatment zoningwise. Another distinguishing characteristic of the site is its narrowness. The original proposals were viewed by the Planning Department as casting an unacceptable shadow over the homes on Tanglewood Road, and the building elevations have been changed so that the lower sections face Tanglewood Road. The landscape architect also testified as to the trees planned for the boundary between locus and the single family homes on Tanglewood Road to form a buffer.

30. In 1965 Newton authorities prepared a General Plan which was never adopted by the Board of Aldermen (Exhibit No. 14). On May 7, 1979 the

Board did adopt a 1980 Comprehensive Plan. (Exhibit No. 15). There was testimony that the city charter give special weight to such a plan. The Plan enumerated certain goals and policies as to housing and open space as did the earlier and separate reports on Housing Goals and Policies (Exhibit No. 18) Land Use Goals and Policies (Exhibit No. 19) and Open Space Plan (Exhibit No. 20) which are elements of the Comprehensive Plan. The Board of Aldermen, acting through the Land Use Committee, was justified in considering the various, sometimes conflicting goals and policies set forth therein, and in weighing favorably those advanced by the proposed zone change and special permit.

31. The Planning Department and the Board's Committee also had before it a traffic survey prepared on behalf of Chestnut Hill Development Corporation (Joint Exhibit No. 5) and were entitled to accept the conclusions therein if they so elected.

32. There is a lengthy waiting list for public housing in Newton, and the so-called 10% ordinance is designed to obtain additional units without the expenditure of public funds by securing a developer's commitment to furnish a certain specified number of units when density concessions are granted. Similarly the age of Newton's population is increasing in both high and low income brackets. Condominiums are designed to serve the former by providing desirable living quarters without the physical burdens of maintenance and by also furnishing security. The obligation to provide low cost units for the elderly on site serves the other end of the income spectrum.

The scope of judicial review in cases attacking the adoption of zoning regulations or amendments thereto is limited. Approval of the ordinance or by-law by the judge is immaterial. Rather there are two important questions to be decided in cases of this nature. The first is whether the zoning enactment (here an amendment) is "an unreasonable exercise of power having no rational relation to the public safety, public health or public morals." **Brett v. Building Commissioner of Brookline,** 250 Mass. 73 at p. 79 (1924) quoted with approval in **Crall v. Leominster,** 362 Mass. 95, 101, 102 (1972) where Justice Quirico wrote:

"This clear limitation of the scope of judicial review has since been consistently recognized and unwaveringly applied in every case involving this question. We have said repeatedly that if the reasonableness of a zoning by-law or ordinance is fairly debatable, the judgment of the local legislative body responsible for the enactment must be sustained.

Another rule which we have followed with equal consistency in the judicial review of municipal by-laws and ordinances is that every presumption is to be made in favor of their validity, and that their enforcement will not be refused unless it is shown beyond reasonable doubt that they conflict with the applicable enabling act or the Constitution. We applied that rule in the first decision of this court involving a zoning ordinance, viz. **Inspector of Bldgs. of Lowell v. Stoklosa,** 250 Mass. 52, 62, and in numerous subsequent cases."

Accord: **Caires v. Building Commissioner of Hingham,** 323 Mass. 589, 593-4 (1949). **Sturges v. Chilmark,** Mass. (1980)[1]. The second question therefore is whether a by-law or ordinance clearly conflicts with either G.L. Chapter 40A or the Constitution.

In deciding these two questions full effect must be given to the increased recognition by the General Court of the role of the local legislative body. General Laws, c. 40A sec. 1A, inserted by St. 1975, c. 808, provides that " 'Zoning', as

---

[1]Mass. Adv. Sh. (1980) 815.

used in this chapter shall mean ordinances and by-laws, adopted by cities and towns to regulate the use of land, buildings and structures to the full extent of the independent constitutional powers of cities and towns to protect the health, safety and general welfare of their present and future inhabitants." This is a broader grant of authority than appeared in section 2 of the original Chapter 40A. Old section 2 also contained a requirement that the zoning regulations in any city or town, shall be the same for zones, districts or streets having substantially the same character. This is the so-called requirement of uniformity. It does not appear in the post 1975 Chapter 40A where provision is made in section 4 for uniformity within districts, but where there is no express provision for uniformity between areas with similar characteristics. It would seem that there may well be valid reasons for treating such areas with similar characteristics differently in determining what best serves the welfare of an entire municipality. Nonetheless, **McHugh v. Board of Zoning Adjustment of Boston,** 336 Mass. 682 (1958) suggests otherwise. At any rate there is sufficient diversity in the neighborhoods involved in the present case to justify the treatment of the locus differently from the surrounding properties. The most obvious difference is the existence of the present nonresidential use of the locus for purposes of the Club and the location thereon of the Club building, the Health Club, swimming **pools and other facilities.**[2] This differentiates locus from the area of single family homes which abut it to the northwest, from the farm which it adjoins on the southeast, from the two family homes which abut the farm, and from the expensive properties which adjoin locus on the west on Dudley Road. While all of this area (exclusive of Dudley Road) had been zoned as General Residence since 1930 until the change here under consideration was made in December 1981, diverse uses had existed within the zone at least since 1955. It is infrequent

that the type of building on a property may serve as justification for a different legislative treatment, but the Appeals Court found this to be one reason to support the decision of the town in **Woodland Estates, Inc. v. Building Inspector of Methuen,** 4 Mass. App. Ct. 757 (1976), first to treat the land of a hospital differently from the land of protesting owners of single family homes, on the one hand, and a nursing home on the other.

There are other differences which bear on the question of uniformity. There is a wetlands area in the rear of locus spawned by Hahn Brook with which future development must be compatible. The Brook is enclosed where it parallels the property line between the Tanglewood Road area and locus, then turns to cross locus and the farm. There also are significant outcroppings of rock on the farm property and also the Louise Road area. While it does not appear that these are so severe as to prevent a use of the farm for Residence E activities if it had been included in the present rezoning, its presence may have entered into the decision of the legislative body. There are wooded areas in the rear of the Tanglewood Road area which give it a surprising feel of the country and a quietness which its location so near to Route 9 belies. However, the entire area is overshadowed by the brooding presence of Imperial Towers, a high rise residential building located across Florence Street from locus and fronting on Route 9 and beyond it, on the opposite side of Route 9, by another high rise residential development. The Imperial Towers property extends from Boylston Street (Route 9) to Florence Street although access to it can only be had on foot, not by motor vehicle. The uses which now permeate the area between Route 9 and

---

[2]The name of Sidney Hill Country Club is a misnomer. In fact there is no golf course. Numerous functions, however, are held at the Club in addition to the facilities available for health related activities.

the northeasterly side of Florence Street strongly suggest that future development on the southwesterly side of Florence Street may for economic reasons be compelled to follow a different residential pattern than now exists for the Tanglewood and Louise Road areas. The problem for decision now is more narrow, however, and centers on whether the City with no application to include Spezzano farm within the rezoning before the Board of Aldermen nonetheless had to rezone both parcels in order validly to create a Residence E District, or whether, assuming uniformity still is required, it might draw the boundaries of the Residence E zone to include only the locus and not also the Spezzano farm. I hold that it can.[3]

The plaintiffs also attack the change in zoning as spot zoning. This familiar concept is frequently treated as an aspect of action violative of uniform classification and therefore bad. See **Hines v. Attleboro,** 355 Mass. 336 (1969). As the defendants point out in their brief, size of the "spot" is no criterion, for the cases have run the gamut. The **Hines** case involved a parcel of land containing 450,000 square feet which is larger than our locus. Smaller parcels than the Country Club which were not vulnerable on this ground included 41,230 square feet in **Henze v. Building Inspector of Lawrence,** 359 Mass. 754 (1971). 92,188 square feet in **Vagts v. Superintendent and Inspector of Buildings of Cambridge,** 355 Mass. 711 (1969) and 19,000 square feet in **Peters v. City of Westfield,** 353 Mass. 635 (1968), 26,830 square feet in **Kennedy v. Building Inspector of Randolph,** 351 Mass. 550 (1967), 80,230 square feet in **Sullivan v. Board of Selectmen of Canton,** 346 Mass. 784 (1964), 65,920 square feet in **Martin v. Town of Rockland,** 1 Mass. App. Ct. 167 (1973) and about five acres in both **Lanner v. Board of Appeals of Tewksbury,** 348 Mass. 220 (1964) and **Raymond v. Building Inspector of Brimfield,** 3 Mass. App. Ct. 38 (1975). In any event, size of the zone is a local

concern which the Courts will not overturn. The decisive element in this aspect of the law is not whether a parcel has been singled out for less restrictive treatment than that of surrounding land of a similar character, but whether this has been done for the economic benefit of the owner of the lot and not to serve the public welfare. The Supreme Judicial Court established this as the governing principle in **Lamarre v. Commissioner of Public Works of Fall River,** 324 Mass. 542, 546 (1949) and expanded on this theme in **Board of Appeals of Hanover v. Housing Appeals Committee,** 363 Mass. 339 (1973) at pages 361-363 where then Chief Justice Tauro wrote:

"However, we have frequently held that a spot zoning violation involves more than a mere finding that a parcel of property is singled out for less restrictive treatment than that of surrounding land of a similar character . . .

We stated the definition of spot zoning in **Lamarre v. Commissioner of Pub. Works of Fall River,** 324 Mass. 542, a case concerning a zoning amendment which converted a parcel of land that had previously been zoned as a single and general (not more than three family housing) residence district into a multi-family residence district. The local housing authority had requested the amendment and it had been approved by the local planning board and the city council because of a shortage of rental housing in Fall River. The facts of the **Lamarre** case are closely analogous to those in the instant case. In both cases, a

---

[3] I have assumed that it is open to the plaintiffs to challenge the boundaries of the new Residence "E" district on the ground that the farm was not included even though they do not own the latter property and are not directly interested in its ultimate disposition.

particular parcel of property was singled out for treatment different from that given to surrounding property of a similar character. The only difference is that instead of the amendment of the local zoning regulation by municipal authorities as in the **Lamarre** case, c. 774 enables the board of appeals and the committee to avoid the effect of the applicable zoning restrictions when they are inconsistent with local needs, a difference which has no bearing on whether either decision constitutes spot zoning.

We held in the **Lamarre** case at 545-546, that "it (the zoning amendment) was not an instance of 'spot' zoning. 'It does not appear that there was "a singling out of one lot for different treatment from that accorded to similar surrounding land indistinguishable from it in character, **all for the economic benefit of the owner of that lot.' "Marblehead v. Rosenthal,** 316 Mass. 124, 126. **Whittemore v. Building Inspector of Falmouth,** 313 Mass. 248, 249. See **Smith v. Board of Appeals of Salem,** 313 Mass. 622" (emphasis supplied). Our definition of spot zoning is in accord with the general view held by most State courts that spot zoning problems arise where a zoning change is designed solely for the economic benefit of the owner of the property receiving special treatment and is not in accordance with ι well considered plan for the public welfare. See Anderson, Am. Law of Zoning, sec. 5.04 and cases cited therein; **Jones v. Zoning Bd. of Adjustment of Long Beach,** 32 N.J. Super. 397.

Thus, the central question posed by this spot zoning challenge is whether the

difference of treatment accorded by c. 774 serves the public welfare or merely affords an economic benefit to the owner of the land receiving special treatment. We decided in the **Lamarre** case that zoning changes affording special treatment to encourage the construction of multi-family residences in cities with housing shortages promote the public welfare. P. 546. We followed this decision in **Henze v. Building Inspector of Lawrence,** 359 Mass. 754, where we held that the need for low and moderate income housing justified a zoning reclassification of a parcel of land from a one and two-family residential district to a multi-family residential district. We think these decisions are dispositive of the spot zoning challenge."

It is apparent that the defendants other than the City will benefit financially from the change of zoning. Nonetheless, the change is not defective if it also serves the welfare of the community as well as the bank books of the land owner. This is so even if the principle of uniformity still exists and has been violated. Housing is the area which has been most often recognized as that wherein the public weal is served by zoning amendments. In addition to **Lamarre,** and **Hanover** there is **Henze v. Bldg. Insp. of Lawrence,** 359 Mass. 754 (1971) which is cited in **Hanover, Cohen v. Lynn,** 333 Mass. 699 (1956) and **Elmer v. Zoning Board of Adjustment,** 343 Mass. 24, 35 (1961). A more unusual case where a zoning amendment was upheld is **Raymond v. Building Inspector of Brimfield,** 3 Mass. App. Ct. 38, (1975) wherein a zoning change to benefit a company which was the community's major employer was upheld as benefiting the public welfare by keeping the industry in the town as against attack that it was done for the economic benefit of only the owner. Similar also to the present case is **Peters v.**

**Westfield,** 353 Mass. 635 (1968) where the zoning boundary between residential and business was readjusted. In upholding the change the Court said:

> "It is plain that a single appropriate boundary change, consistent with the long range plan, has been adopted at this time at the instigation of the lot owners who will profit therefrom. It cannot be ruled, however, that benefiting them is the sole purpose of the change. **Caires v. Building Commr. of Hingham,** 323, 589, 595-596. **Raymond v. Commissioner of Pub. Works of Lowell,** 333 Mass. 410, 412. **Lanner v. Board of Appeal of Tewksbury,** supra."

At first blush the present change seems designed to benefit only the owners of locus. However, a preponderance of the evidence bespeaks the fact that the zoning amendment serves a useful purpose. Firstly, there are the statistics which appear in Housing Goals and Policies (Exhibit No. 18) which suggest that the population of Newton is more elderly than that of much of metropolitan Boston. The type of condominiums envisioned here permit affluent members of this population to sell their single family homes and yet remain as property owners in Newton without the cares of home ownership which "condos" are designed to avoid. Security will also be available. The Housing Goals and Policies are one facet of Newton's Comprehensive Plan (Exhibit No. 15) to which Comprehensive Plan the charter gives special weight. In the plan itself is found support for a development similar to "The Fountains". While Chapter 40A does not require a master plan, the concept is recognized and communities other than Newton have adopted them in accordance with guidelines. See, for example, **Henze v. Bldg. Insp. of Lawrence,** supra.

It is clear from evidence that one of the objectives which led to approval by the Board of Aldermen of the change in zone was the elimination of a use which the neighborhood had come to view as a nuisance. Traffic generated by Sidney Hill, parking which overflowed that available on the grounds, noise and late night disturbances made the facility unpopular. In weighing the advantages of a continuation of the present use against the change of the residential district to permit an apartment like facility, the legislative authority was entitled to give weight to an anticipated improvement in the impact on abutters anticipated by an end of club activities and the elimination of a non-residential use together with the desirability for the community as a whole of the continuation of residential uses south of Florence Street even if with a greater density than the remainder of the neighborhood. The plaintiffs argue that there is a similarity in ownership between Sidney Hill and Chestnut Hill and that it is incongruous, inequitable and poor public policy to permit those with the beneficial interest in Sidney Hill to benefit from their own failings. The Board of Aldermen's Land Use Committee considered the argument that the owner who was selling the site should not benefit from past transgressions, and it found **other factors more persuasive.**[4] The short answer to the plaintiff's argument is that the Board of Aldermen were entitled to consider the reverse side of the coin, and to authorize the removal of sources of annoyance to the abutters; the plaintiffs' approach would penalize the defendants, but it also penalizes the innocent neighbors.

As bearing on the nuisance nature of the present use, it is significant that only one plaintiff is a resident of Tanglewood Road, the area of single family homes close to the club, and most affected by the

---

[4]It is not apparent from the report whether the Committee was aware of the identity of interest between the beneficial owners of the locus and Chestnut Hill Development Corporation.

daily irritations of proximity to the Club.[5] The two plaintiffs who live on Dudley Road may find the height of the Fountains to be of concern, but their homes are at sufficient distance from the club not to be immediately affected by the abuses. The Aldermen were justified in discounting the height factor in light of the Imperial Towers structure and those beyond it on the opposite side of Route 9. The remaining plaintiff is a resident of Brookline, and it would appear he must be affected primarily by a change in the traffic pattern. A study has been made as to this (Joint Exhibit No. 5) and was one factor on which the legislative decision was entitled to rest even though others might dispute the conclusions. Other public purposes served by the present rezoning or at least by the requirement of a special permit thereunder include the conservation restriction, site plan control and the benefits to the common weal of the "Ten Per Cent Ordinance."

There was evidence also that the nature of Newton, one of the Metropolitan Boston's older cities, and more particularly its population, may be changing. The evidence also suggests that tax revenues to be generated by the change in use will be increased, a factor which the board was entitled to consider in these days of Proposition 2-1/2. Finally the change in the entire Route 9 area between Hammond Pond Parkway on the east and Florence Street on the west and its effect on the locus was a permissible element to be weighed. It seems doubtful that any of the undeveloped land on the southwesterly side of Florence Street can, from the sheer economics of the area, support the construction of new single family homes in the future. The city is entitled to plan for the future, **Lamarre, v. Commissioner of Public Works of Fall River,** supra, and I am unable to say that its decision to rezone the locus is not "reasonably related to public convenience and welfare and calculated to encourage the most appropriate use of land throughout the city." **Peters v. Westfield,** 353 Mass. 635, 639 (1968). Since the

reasonableness of the ordinance is fairly debatable and has not been shown to conflict either with the enabling act or the Constitution, **Crall v. Leominster, supra,** it must be upheld.

The related case remains a Superior Court action. Immediately after the Board of Aldermen approved the zoning amendment it voted to grant a special permit for the use of the locus (the entire area rezoned) in accordance with the amendment and subject to conditions carefully delineated therein. The proposals on which the change of zone and the special permit were based initially were submitted to the city's Planning Department. After a study, conferences with the attorney for the developer and research, a report was made to the Mayor. Joint Exhibit No. 3). A committee of Aldermen and the Land Use Committee then studied the proposals and reported to the full board (Exhibit No. 29). The change in zone and the special permit were considered in tandem, a new technique originating perhaps in certain substantive zoning changes embodied in Chapter 808 of the Acts of 1975.

While historically it would seem that the intention of the General Court was to have a zoning district greater in area than that encompassed by a special permit simultaneously granted, the procedure does not appear fatally defective so long as the zoning change can be upheld. Provision for special permits is found in G.L. c. 40A sec. 9, the first paragraph of which reads:

> "Zoning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit. Special permits may be issued only for uses which are in harmony with the general purpose

---

[5]Certain of the plaintiffs seem to object to the "in tandem" procedure of a zone change and special permit rather than to the effect on their property.

and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use.''

In acting upon the special permit the Board of Aldermen was acting as an administrative body rather than in its role as a legislative body which it fulfilled in adopting the amendment to the zoning ordinance. As was explained by Justice Quirico in **Middlesex B. S. R. R. Co. v. Board of Aldermen,** 371 Mass. 849, 854-55 (1977), a case which arose under the previous version of G.L. c. 40A:

"It follows from what we have said above that in the city of Newton the members of the board of aldermen have been designated by ordinance to serve as the legal equivalent of the zoning board of appeals in other municipalities with respect to the issuance of special permits. In discharging the duties imposed on them by the zoning ordinance with respect to special permits those persons are acting as members of a local administrative board, and not as members of the municipal legislative body. Any reference to the ''board'' from this point on in this opinion will be to the administrative board acting pursuant to the provisions of G.L. c. 40A, and the Newton zoning ordinance, with the same power and authority which would have been possessed by a zoning board of appeals with reference to special permits if the ordinance had not designated the members of the board of aldermen to act as such a board for such permits.''

One disadvantage of such a large board of appeals was pointed out by the Supreme Judicial Court in the earlier case of **Shuman v. Board of Aldermen of Newton,** 361 Mass. 758 (1972) and which is found in the present case as well:

"Although the decision is cast in the form of an order appropriate for a legislative body; the deficiencies of the decision (as the judge found) are insubstantial . . . and not prejudicial to the neighbors. The first paragraph of the decision states the board's general conclusions. The unusually detailed conditions show thoughtful consideration of the objections advanced in opposition to the permit. They show also the board's decision on each of them. This board, and other boards acting in like situations, should prepare decisions with more specific and complete findings and statements of reasons. Some of the deficiencies were met by the statement of conditions.''

In the present case, some of the deficiencies were met by a report from the Chairman of the Land Use Committee (Exhibit No. 29) and by the statement of Conditions as in **Shuman.** In addition, the plaintiffs question the validity of the special permit only on the ground that it bears the infirmities of spot zoning. The Supreme Judicial Court has already determined, however, that the granting of a special permit cannot constitute spot zoning. **Kiss v. Board of Appeals of Longmeadow,** 371 Mass. 147, 156-158 (1976). This is because the permit granting action is an administrative function whereas it is the legislative power involved in adopting or amending an ordinance which may run afoul of the concept of spot zoning.

I have considered the evidence introduced in both cases to the extent it is relevant and have made detailed findings of fact. The plaintiffs have not attacked the special permit other than as spot zoning. I, therefore, find and rule that no other issue concerning it is open, but should I be in error, I further find and rule on all the evidence that the special permit is for a use that is in harmony with the intent and purpose of the ordinance,

the decision to grant it does not rest on a legally untenable ground, and such action is not unreasonable, whimsical or arbitrary. See **Garvey v. Board of Appeals of Amherst,** Mass. App. Ct. (1980)[6].

Judgment accordingly.

**Marilyn M. Sullivan, Justice**

---

[6]Mass.. App. Ct. Adv. Sh. (1980) 415.